Mel Marin                          January 17, 2024
Box 80715
San Diego, CA 92138

Plaintiff
*Pro Se*



**FILED**

Jan 17 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY  s/ SusanNyamanjiva          DEPUTY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MEL MARIN, | ) | Civil **'24CV0110 TWR MSB** |
| | ) | |
| Plaintiff, | ) | COMPLAINT FOR $770 MILLION |
| | ) | DAMAGES FOR VIOLATION |
| v. | ) | OF THE AMERICANS WITH |
| | ) | DISABILITIES ACT |
| THE EDUCATIONAL TESTING | ) | AND |
| SERVICE (ETS), | ) | THE REHABILITATION ACT |
| | ) | AND |
| | ) | FOR BREACH OF GOOD |
| | ) | FAITH AND FAIR DEALING |
| Defendants. | ) | |
| | ) | JURY DEMANDED |

## JURISDICTION

1. This court has federal question jurisdiction under 28 U.S.C. §1331

because a vindication of federal rights under federal laws is asserted, and diversity

jurisdiction under § 1332 because plaintiff is domiciled in New York but resides

here temporarily and was injured here by the actions of the defendant, and the

defendant is domiciled in New Jersey.

1

2.   This action is also timely no matter when the ETS adverse acts started because ETS continues today to refuse to modify their one-size-fits-all policy of denying necessary and reasonable disability accommodations which proves the deliberate indifference described herein, under the rule in <u>Evans v. City of San Diego</u>, No. 06-cv-877, 2008 U.S. Dist.LEXIS 25054 at * 12 (S.D. Cal. March 27, 2008)(claims based on deliberate indifference start to run on the last day of refusal of the treatment requested, not the first).

3.   Plaintiff has standing because he is a qualified individual with a disability that interfered with a major life activity which is seeing straight and reading like others and which was verified by a half-dozen doctors and colleges, and who was discriminated against or excluded from participation *meaningfully* in the tests at issue here solely because of his disability which caused a failure to gain admission to graduate and law schools and denied that education and the work her could have done, and this states claims under 29 U.S.C. Section ( § ) 794 (the Rehabilitation Act) and 42  U.S.C. §§ 12132 and 12181 (the ADA).

4.   And it does not matter that he did not actually apply to take the test at issue nor apply to the law and graduate schools first, because (a) none of the schools would permit an application without these test scores that these defendants would not allow him to take with a reading accommodation that his condition requires, and (b) if he took their tests they would with a 100% certainty create an

"F" grade since he could not read and answer most of the questions in the time they permitted without accommodations he requires. That low test grade would then destroy his standing as a "qualified" graduate school applicant and prevent him from suing under this Act, and could never be erased from his academic history, as warned by the court ruling in Rittenhouse v. Board of Trustees of Southern Illinois University, 628 F.Supp.2d 887, 890 (S.D. Ill. 2008)(law student who received low grades in the first year was not qualified to continue to the next law school year and had no standing to complain that the denial was based on disability because the grades were too low so he was not qualified for reason of grades and not a disability denial).

5.   Additionally, even without taking the tests and matriculating in the law schools, Mel still qualifies to sue as a "tester", which is a disabled applicant who tests the waters of the facilities or activities before relying on them to see if their customs or policies violate the federal disability laws so he can tell if his disabilities effectively unfairly exclude him from meaningful participation, as held in Tandy v. City of Wichita, 380 F.3d 1277, 1287 at [5](10th Cir. 2004).

6.   In other words, Mel has no duty to take the tests, and fail them, before he can sue for denial of the disability accommodations he needs. He has a right to see the giant Tsunami wave coming and refuse to submit to that punishment and he can still sue to reach a safe shore.

7.   His high damages claims are also legitimate for diversity jurisdiction purposes and not inflated to qualify for a federal court civil trial that require higher damages claims and commonly deliver higher jury verdicts than state courts, because his salary in the career at issue which he would likely have earned at graduation after 3 years of a top law school starting in Fall 2023 and graduating in Spring 2026 is estimated to be about $200,000 per year in 2023 dollars (which would be more in 2026 dollars from inflation and salary increases).

8.   Because Mel spent two years (2022 and 2023) trying to mitigate losses, which means trying another way around the ETS damage, and this law suit will take 2 more years (2024 and 2025), and he will lose another full year in 2026 in a top 4 year college to generate good letters of recommendation for his law school applications after this court issues an injunction to force ETS to accommodate Mel's disability (if this jury finds the ETS policy now violates disability laws), and another full year (2027) for the GRE testing and application process to a law school, he could start law school for the earliest time in Fall 2028.  Those lost 5 years, therefore, represent a loss of at least $1 million for compensatory damages alone, delaying the salary Mel could have earned sooner rather than later. Compensatory damages, therefore, means a jury award of $1 million for Mel to compensate him for the delay of at least 5 full years before starting a salary he could have earned for five years.

4

9.   Additionally, Mel seeks punitive damages as a disabled plaintiff may do if the jury is able to conclude ETS leadership (and, therefore, ETS) "knew" or should have known that its conduct was violating federal law but it continued to violate that law because that continuation to violate constitutes malice that under federal law is all that is necessary for the jury to award punitive damages, under the rule in Kolstad v. American Dental Ass'n, 527 United States Supreme Court 526, at page 535 (1999)(the definition of malice that allows punitive damages is not hatred or ill-will: it is only enough that the defendant knew or *should have known* that he "may be acting in violation of federal law" ).

10.   Also, one of the required elements that a jury must find in this case to make an award in a Rehabilitation Act claim is that the defendant was "deliberately indifferent" to the disabled's pleas to stop their policy of unlawful and heartless exclusion, which may be found by the jury if they agree that the company ignored their violations or failed to stop the unlawful conduct after repeated pleas.

11.   So, if the jury makes that finding of deliberate indifference, they will automatically also be making the finding that the ETS was guilty of malice that allows punitive damages as in Kolstad, above because deliberate indifference means they should have known they were violating federal law and continued.

12.   If punitive damages are agreed-to by the jury, the jury may then award up to and including 1/3 of the net worth of the defendants, according to <u>Adams v. Murakami</u>, 54 Cal.3d 105,112 (1991)(California courts have allowed up to 33% of net worth for punitive damages).

13.   The net worth of ETS is approximately $2.3 billion according to the valuation firm growjo.com as published on January 13, 2024 at <u>https://growjo. com/ company/Educational_Testing_Service</u>, and ETS made $1.14 billion in revenues per year for its monopoly everywhere in the world on college and graduate school admission tests as of 2015 according to the Washington Post at https://www.washingtonpost.com/news/answer-sheet/wp/2015/09/30/how-much-d o-big-education-nonprofits-pay-their-bosses-quite-a-bit-it-turns-out/ . So that means their net worth may be far greater now, possibly double that in 2015, because it is 9 years later than 2015 so the jury be permitted to award over $1 billion in punitive damages for Mel, and much of that would then be returned to the United States as income tax under the highest tax rate and effect a return to the federal government of some of the billions the United States has given ETS for research and teaching in the last 7 decades.

## GENERAL ALLEGATIONS

14. In 2021 plaintiff was engaged in college classes that in the normal course with the cooperation of colleges allowing additional testing time for his visual disabilities that the disabilities require, would allow him to finish key qualifying courses for graduate science school and law school applications and meet application deadlines in Spring 2022 to allow Marin to start law school in Fall 2022 and a top graduate science programs in Fall 2024.

15. The goal was to complete law school, and to enroll part-time in a graduate science program to reach a graduate degree to qualify for the patent test in Washington, D.C. at the Patent and Trademark Office, and work as a patent *agent* if he could not gain bar admission with an average salary of about $117,000 which would be expected to increase to $163,000 with a graduate science degree two years later (based on Exhibit A) , or to work as a patent *lawyer* commanding an average salary of about $309,000 which would be expected to increase to about $400,000 a year after earning a graduate science degree (based on Exhibit B).

16. Or, if he scored as expected on the GRE as he did on the SAT, he expected to be admitted to a top law school like Yale, and graduate into a law job paying $200,000 without a patent license. Over five years, that means $1 million without the added emotional distress and threat to his life that the ETS has created.

17. The Graduate Record Exam is one of the two tests law schools require

7

(along with the Law School Admissions Test) which was a pre-requisite for admission to the top tier law schools Marin sought and which are required for a patent agent or lawyer to get work in that narrow but highly competitive field. He could take either test, but the Law School Assembly Council that administers the LSAT refused to consider any disability accommodation at all.

18.   Additionally, Mel had a 3.6 GPA in college science courses, and a degree in jurisprudence (law) with high honors from Oxford University in England (2nd Class), but a foreign law degree is not enough to practice patent law in Washington D.C. for a patent law firm so he must get an American law degree.

19.   He was admitted to Yale for a PhD in political science in 1978 but could not pay their tuition so he could not go. That department chair said he would be welcome back when he can (he still can't pay it). He was also admitted to one of the top 5 science schools in the nation, the Engineering School of U.C. Berkeley for an engineering degree, and he was invited to apply to another top school, Columbia School of Engineering where he could take courses part time by computer in his last year at law school, to produce a graduate engineering degree a year after law school to enhance his chances for work at a high paying patent law firm which after a few years would increase his salary dramatically.

20.   He also received repeated invitations to practice international patent law  from overseas patent firms in 2020, 2021 and 2022 because in U.S. Army

8

Special Operations he had studied and could speak Arabic, Chinese, French, Greek, Russian, Serbo and Spanish.

21.   So with this background and honors college work Mel's chances for work in that career were not speculative, but were likely, according to court holdings in Haim v. Islamic Republic of Iran, 425 F.Supp. 2d 56, 71 (IV) n. 2 (D.C. D.C. 2006)(damages for loss of future earnings for future career were not speculative based on evidence that she was on Dean's list and showed exceptional academic performance), and Warren v. Greenfield, 595 A.2d 1308, 1314 (Pa. Super. 1991) (the fact that plaintiff's business was "new and untried" does not prevent the plaintiff's losses from being foreseeable), and Ray v. Wal-Mart Stores, Inc., 120 F.3d 882, 885 (8th Cir. 1997) (career damages were not speculative even though plaintiff was not licensed yet, nor certified, and had not been to any civilian school for it, because he had military air traffic training suggesting he could succeed), and American Board of Internal Medicine v. Muller, 10-cv-2680 (E.D. Pa. March 10, 2011)(doctor states a claim for interference with prospective business by being denied future admission privileges at hospitals), and Westlake Comm. Hosp. v. Superior Ct. Of L.A. County, 17 Cal.3d 465, 131 Cal.Rptr. 90, 91, 96 n. 5 (1976) (There is an established principle at common law that an action will lie where the right to pursue a lawful business, calling, trade, or occupation is intentionally interfered with either by unlawful means or by means

9

otherwise lawful when there is a lack of sufficient justification), and <u>Bowers v.</u>
<u>NCAA</u>, 475 F.3d 524 (3d Cir. 2007) (student athlete may state claim for loss of
entire career by denial of athletic participation even though he never took classes
because he was wrongfully stopped early).

22. In pursuit of this career, in late 2021 plaintiff Mel made inquiries with
the ETS to determine if he could sit for the GRE test with a disability
accommodation to extend the time requested by his medical providers in their
reports and letters.

23. The ETS "dragged its feet", sending rules that allow only 100% extra
time to take the test but when Mel made additional inquiries to see if they allowed
exceptions to those published rules to permit 300-500% extra time if the student's
doctor's supported it, they failed to answer fully or quickly.

24. Mel tried to get that extra time with correspondence on 11/30/2021,
and on 12/31/2021 and on 1/18/2022 and on 1/28/2022. In these ETS agents did
say that an exception to their 100% extra time rule might be possible, and
suggested sending doctors' reports. The doctors did make requests and Mel sent
them.

25. On February 11, 2022, however, the ETS flatly denied the requests for
the disability accommodation that Mel required and that his doctors requested.

26.   In that same denial, however, the ETS invited Mel to submit more *recent* medical information to justify 300-500% extra time for testing.

27.   Mel did so.  He went to a neuro-ophthalmologist who was a graduate of UCSD and is the leading eye specialist in the field in San Diego, and possibly in the world.  That doctor did a thorough test and on a later appointment revealed to Mel that she called the ETS staff to see what they wanted exactly to justify the extra time Mel needed.  But they refused to tell her.  She reported to Mel that she could not draft a better letter for him because it was clear to her that they would refuse no matter what she said.

28.   Mel followed-up asking the ETS staff if they could provide an example of an application for 300-500% more time that they had approved, after "redacting" or  removing the names of their disabled students with reading problems for privacy reasons so Mel's doctor could touch on each of those points herself in a new letter and report.

29.   ETS still refused.

30.   Mel's and his doctor's subsequent efforts with ETS to try to get this extra information included April 6, 2022, April 14, 2022, May 17, 2022, May 25, 2022, June 19, 2022, June 24, 2022, July 19, 2022, and August 22, 2022.   That makes over a half-dozen refusals of ETS to identify exactly the showing they required to allow 300-500% more than the normal testing time which would mean

11

breaking the test up to take it over 4 days rather than the day that they now permit
for 100% extra time, but not changing the test content and not making the test any
easier.

31. They failed to provide it because they had never granted a disability
accommodation to anyone greater than 100% extra time, and they had never
approved a request with the detail that they said they needed in their February 11,
2022 denial because their 100% disability extension was absolutely fixed, a
permanent "cap" beyond which they would not go because it was too annoying.

32. That alone suggested ETS may be violating disability laws according
to the court of appeals of this federal trial court in <u>Armstrong v. Davis</u>, 275 F. 3d
849, 862-63 n. 20 (9th Cir. 2001)(defendant may violate these disability acts if the
administrative board places a limit on the accommodation allowed where the
person needed more to be meaningful) and <u>Stevens v. Harper</u>, 213 F.R.D. 398, 375
(N.D. Cal. Sept. 11, 2002)(alleging a failure of accommodation is enough to state
a claim without showing how).

33. Therefore, ETS simply lied or they misled plaintiff when they
suggested that a better description of the disability could possibly generate 300-
500% extra time since their custom and policy was actually to refuse completely.
So their invitation to try again was fake.

34.  As a result of these refusals, Mel had to "mitigate" his losses, or try to find other ways around the ETS refusal.  He investigated and sought waivers of the GRE and LSAT requirements of the Law Schools of Yale, Harvard, Cornell, Seton Hall, UCLA, Stanford, Hastings (San Francisco), Columbia, and NYU, so he could apply to those schools without those tests.  They refused, giving the basis that the American Bar Association requires at least one of those tests as a condition of law school application.

35.  ETS knew or should have known that would happen, and they knew or should have known that a student with a serious visual impairment who could not reach and read 80% of the questions presented in the time ETS permitted would fail the GRE horrendously and be denied admission to those and to all law schools in the nation for the rest of his life.

36.  For instance, Exhibits C, D, and E attached hereto, show ETS leadership knew or should have known that Mel would suffer a poor result in their test and likely be denied admission to law schools if he did not have the extra time his doctors request as a disability accommodation. This is because Exhibit C proves they had seven decades of research into the damage that visual impairment has on testing, and Exhibit D in 1990 (3 decades ago), and Exhibit E giving research in 2008, 2009, 2010 specifically studied "the impact of accommodations" for the visually impaired in testing.  Exhibits F and G proves if this were not

enough to show ETS knew the damage they cause the visually disabled by refusing to provide an accommodation that matches their disability, they show the federal government gave ETS millions more dollars in 2011 to look again.   So these exhibits are documentary proof that they knew Mel would be crippled by their testing alone.   And they intended to cripple the crippled so they do not rise again.

37.   In other words, the ETS was so certain their "token" disability accommodation of 100% would fail the disabled, that they *wanted* the disabled to fail to keep them out of graduate and laws schools to accommodate those colleges who hate the disabled and routinely refuse to provide accommodations.

38.   These documents as exhibits also prove ETS knew their 100% accommodation was only meaningless "window dressing" to give the impression of accommodation.   ETS maintained that window dressing, so they could argue to a jury that they provided reasonable disability accommodations to all, to eliminate a threat of exposure of low disability accommodations that could cut-off billions of dollars of funding sources when the accommodations are revealed by a jury to be fake and which could threaten the salary of the $1 million a year of the ETS leadership.

39.   ETS was and is well aware that they are **The Gate** that makes or breaks careers and dreams for millions of students for over 7 decades.   They knew or

14

should have known that their tests alone destroy those careers and dreams for the disabled. The Law School Admission Council reported that as high as 40% of law school applicants have disabilities. But Exhibit H shows while 25% of all Americans are disabled and while 40% of law school applicants are disabled, only 10.7% of them *accepted*.

Therefore, *something* in the GRE test causes 90% of the disabled to fail to reach *any* graduate school, not just the top schools. Why should taxpayers pay disability payments for the entire life span of the disabled when many of them could prove they can think and answer test questions if the ETS would let them, and get into graduate schools, become specialists, and earn a living and stop making the healthy pay for them? The answer to chronic disability, is *more* education as the Salvation Army, Goodwill Industries and Deseret Industries have proved. But the ETS denies it by testing something *other than competence*.

40. That *something* is speed. Both the GRE and LSAT measure how *fast* a student may read and answer, not how good they are on content and reasoning that ETS claims to test on. So their test itself is a failure as a fair measure of ability in graduate schools. It is mainly a test of good health and speed.

41. So the GRE is a scam. It is an entrenched, institutionalized gate that lets into graduate schools 90% of the applicants who are healthy, and denies 90% of the applicants who are not healthy, solely because of their disability, by forcing

speed in a wheel chair or in a struggle to see straight and mark little circles too small for the visually challenged to even see apart.   It cripples the crippled.

42.   How fast can a near-blind student read the passage in the question and the four choices and find the right box on the computer screen 1,000 times?   That is what it tests; not how well the student can think nor how qualified she is for advanced research and writing in graduate and law schools.

43.   And those disabled who fail the GRE face almost the same bias in the private employment market where 80% of the disabled are refused work of all kinds, according to the SHRM Foundation on March 8, 2023 at www.shrm.org/ topics-tools/news/inclusion-equity-diversity/employment-rate-rising-people-disabilities.

44.   The California Budget and Policy Center also revealed in March 2023 that California has 171,000 homeless, and 64% of them who crowd California streets are temporary.   But 36% are there chronically *because they are disabled*, which means until death.   Https://calbudgetcenter.org/resources/who-is-experiencing-homelessness-in-california/.   Some are mentally challenged but the Rehabilitation Act protects them too.   And most are not.   Many sleep in a car, because the ETS keeps them there and refuses to allow them to work by locking them out of their Gate with an insufficient testing accommodation.

45.  So, the path to freedom from that Gulag of the street for them and for this plaintiff is higher education, even graduate school.

46.  The pain and suffering caused by this fixed prejudice of ETS about which this plaintiff complains is not just measured by the growth of his infections caused by stress but also by the increase in sadness and desperation that he has to fight every day and every night as he slips quietly in the night into and out of his car so he is not spotted and ticketed, like a prisoner escaping from a jail of tears every day.  Disability is jail.  Exhibit H proves 1/4 of the United States is in that prison. And the ETS keeps them there, by a policy denying competent students and veterans a *fair* chance to take their tests to show disability can succeed.

47.  Mel has a history of serving this country in special operations, wrote a book on foreign policy, held a White House pass for daily access to The President. The President took Mel's advice to change NATO policy that was in a National Intelligence Estimate that nobody else had considered, and that changed policy is still in force today.  But other representations of his history that might show his qualifications to be an attorney are limited by secrecy labels on his record, and sealed by the U.S. Court of Appeals at <u>Marin v. DOD</u>, 05-1139 (3d. Cir. 2005).

48.  But Mel can still serve his country if the ETS lets him, or if *this jury* forces the ETS to let him out of the car by finding ETS policy widely unreasonable and violative of the duty of reasonable accommodation, and if this jury also kicks

ETS in the butt with a punitive damages award large enough to wake them up and stop their stubbornness, which is what a punitive damages award is designed to do.

49.   Additionally, the loss of time Mel had to endure to try a different career to get around that refusal (which is called mitigation of damages that he must do before suing), and the years to file and prosecute this law suit were losses of years that were foreseeable to ETS because of their extensive research showing that kind of harm Mel would suffer, and about which Mel submits now exhibits attached hereto which proves they knew.

## FIRST COUNT FOR VIOLATION OF THE REHABILITATION ACT SECTION ( § ) 504 AT 29 UNITED STATES CODE (U.S.C.) § 794

50.   All allegations above are incorporated into this cause of action by this reference.

51.   The Rehabilitation Act Section 504, re-stated in federal rules at 34 Code of Federal Regulations (C.F.R.) § 104.43(a), provides that no qualified individual with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any postsecondary education program of a recipient of federal funds.

52.   The formal elements that a disabled plaintiff must allege and prove to a jury for an award in his favor include 7 elements.  Four are these:

> (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance.

Duvall v. County of Kitsap, 260 F. 3d 1124, 1135 (9th Cir. 2001).

53.   A **fifth** element is for the disabled to show he was denied *meaningful* benefits, not just any benefits that might show fake "window dressing" by the agency to give the false impression of compliance with federal law, as required by the U.S. Supreme Court in Alexander v. Choate, 469 U.S. 287, 302 (1985), and by the appeals court to this trial court in Crowder v. Kitagawa, 81 F. 3d 1480, 1484 (9th Cir. 1996) ("The [Alexander] Court . . . determined it more useful to assess whether disabled persons were denied 'meaningful access' to state- provided services."), which was followed by Kling v. Los Angeles Cty., 633 F.2d 876, 878 (9th Cir. 1980) ("[S]ection 504 guarantees 'meaningful access' to programs or activities") and Mark H. v. Hamamoto, 620 F.3d 1090, 1096 (9th Cir. 2010) ("Hawaii DOE is liable for damages for violating § 504 if it failed to provide Natalie or Michelle a reasonable accommodation that they needed to enjoy *meaningful* access to the benefits.") and A.G. v. Paradise Valley Unified Sch. Dist. No. 69, 815 F.3d 1195, 1204 (9th Cir. 2016) ("meaningful access" to the benefits

"that were available as reasonable accommodations".) and <u>Cebulski v. San Diego Unified School District</u>, No. 21-CV-503-CAB-JLB (S.D. Cal. April 1, 2022) ("meaningful access") and <u>Musgrove v. Hanifin</u>, No. 20-cv- 00614-GPC (S.D. Cal. May 12, 2021)("Section 504 . . . does require reasonable modifications necessary to correct for instances in which qualified disabled people are prevented from enjoying 'meaningful access' to a benefit because of their disability.").

54.   A **sixth** element that must be alleged and proved is that the ETS denial must show "deliberate indifference", where "deliberate indifference" means making a deliberate decision to *not* offer an accommodation that is "reasonable on its face, i.e., ordinarily or in the run of cases" according to <u>Mark H. v. Hamamoto</u>, 620 F.3d 1090, 1096 (9th U.S. Circuit Court of Appeals 2010).

55.   And, if the extra accommodation does *not* look reasonable on its face, the "run of cases" for the jury to apply to see if it still is reasonable is the test the court held in <u>Mark H. v. Hamamoto</u>, which is to compare what was considered a "reasonable" or necessary accommodation in other cases such as <u>In re: U.C. Berkeley</u>, Case 09-14-2251 (OCR Dec. 17, 2015) which case is attached to this complaint as Exhibit I.

56.   In that case of U.C. Berkeley, the Office of Civil Rights of the U.S. Department of Education ruled that an extension of time to do school work and take tests for a disabled student was reasonable no matter how long it took, up to

two years longer to finish a one semester class, where there was no evidence in that case that the extra time would alter the content of the questions or lower the standard for grading than other students had to face.

57.   In other words, that case stands for the rule that delay in completing the activity is a reasonable accommodation no matter how long the condition requires, and is not a substantial alteration of the job of the agency to justify a denial according to the Office of Civil Rights, the federal government agency designated for enforcement of the Rehabilitation Act against colleges.

58.   That letter-ruling at Exhibit I also shows U.C. Berkeley agreed.

59.   But, of course, that was a public college case, based on the general rule at Douglas v. Cal Dept. of Youth Auth., 271 F.3d 812, 819 (9th Cir. 2001)( the entire State of California and all of its departments are caught by the act because California accepted federal funds through one state agency).

60.   Yet it was the same result in private institution cases, such as In re: American Jewish University, March 21, 2018, Office of Civil Rights #09-18-2036, Resolution Letter ("individuals with disabilities must be provided with aids, benefits, or services that provide an equal opportunity to achieve the same result or the same level of achievement as others. 34 C.F.R. § 104.4(b)(2)") and Gorman v. Bartch, 925 F.Supp. 653, 657 (W.D. Mo. 1996)(statute applies to all programs and activities as long as they receive federal funds) and Moore v. Sun Bank of

North Florida, N.A., 923 F.2d 1423, 1431 (11ᵗʰ Cir. 1991)(private bank is caught by the duties of the Rehabilitation Act because it participates in lending guaranteed SBA loans backed by the United States) and Sanders v. Marquette Public Schools, 561 F.Supp. 1361 (W.D. Mich. 1983)(if any program of the institution receives federal funds, the entire institution is caught by the Rehabilitation Act) and Moreno v. CONRAIL, 99 F.3d 782, 784 (6ᵗʰ Cir. 1995) (private railroad was caught by the Act because it accepted federal funds for track improvements).

61.   Based on these cases, this jury may conclude that because ETS did not provide Mel with benefits to provide him an equal opportunity "to achieve the same result of the same level as others" (like extra time his condition required), the ETS accommodation limited to only 100% extra time when Mel needed 300-500%, was unreasonable so it violated the rehabilitation Act at § 504.

62.   A **Seventh** and final element, as a practical matter is the plaintiff may be required to allege and testify in trial to some harm visited upon him by the unfair policy of denial of a meaningful accommodation, although the Rehabilitation Act does not actually require proof of injury.  This is because standing in a federal court to reach a damages award (standing means the right to use a federal court) which is called Article III standing after Article III of the Constitution, still requires a showing of injury even if the disability statutes are

clearly violated, as held by <u>Fortyune v. American Multi-Cinema, Inc.</u>, 364 F.3d 1075, 1081 (9th Cir. 2004).

63.   And since an injunction is also sought against ETS to force ETS to give Mel the 300-500% extra time, Mel must allege a "real and immediate threat of injury" in the future.   That same appeals court ruled that this is satisfied if the plaintiff (Mel) can prove the offending defendant (ETS) "had at the time of the injury, a written policy, and that the injury stems from that policy", because "there is an implicit likelihood of its repetition in the immediate future" at <u>Fortyune v. American Multi-Cinema, Inc.</u>, at page 1081 (9th Cir. 2004).

64.   Mel made that allegation above, when he alleged the ETS "rule book" backed provided a 100% cap on extra time for any disability.   It still does today. And it will continue this year and for 7 more decades unless this jury changes it by holding that 100% may not be enough for all disabled so ETS violated the Act.

65.   All of these 7 elements are now alleged by this plaintiff and which he will prove a trial, are as follows.

66.   **Element (1)** is present here because plaintiff has a visual disability that severely interferes with his ability to read at the speed others can read and on which the time deadlines were created by the ETS.

67.   Mel presented statements to the ETS from colleges and from his eye specialists that made or implied that conclusion that he has a serious disability that

23

interferes with a major life activity, of seeing straight. He does, in fact, have that

disability and the EEOC Enforcement Guidelines on the Americans with

Disabilities Act and Psychiatric Disabilities 3 (March 25, 1997) states that seeing

and sleeping are major life activities and these are severely damaged in this

plaintiff (Mel).

68.   Therefore, Mel has a "physical or mental impairment that substantially

limits one or more of [his] major life activities" as described by Congress at 42

U.S.C. §§ 12102(2)(A), and 12112(a).

69.   Mel also combats serious emotional strain and loss of sleep resulting

from the ETS denial to prevent Mel from moving forward "solely because of this

disability", and that emotional trauma may also base a jury award according to

McAlindin v. County of San Diego, 192 F.3d 1226, 1232-33 (9th Cir. 1999).

70.   **Element (2)** is present here because but for the difference in reading

speed caused by his eye injuries, he was qualified to take the GRE test and he is a

graduate of an American college which qualified him to take the GRE test.

71.   Mel would also have been able to qualify for fee discounts.

72.   Additionally, Mel took the SAT from ETS in his last year of high

school and scored a grade at about the 98th percentile which is the equivalent to a

high "A" that got him accepted by the University of California, and ETS records

show student scores in their SAT tests and their later GRE tests are commonly

almost identical.  So Mel was otherwise qualified to take the test and to score in
the range required by the top law schools and graduate programs in the nation.

73.   Documentary evidence presented now supports this allegation by Mel.

74.   Specifically, Exhibit J shows because Mel was likely to score at the
98th percentile in the GRE if he could only read the questions in time, he would
have earned a GRE score of 332.

75.   Exhibit K then, shows that score of 332 is enough to gain admission to
Yale Law School, which is ranked as number 1 in the nation.  Therefore, the ETS
unfairly denied Mel the best chance anyone could have.

76.   Mel's eye injuries also occurred after taking the high school SAT, so
now he needs the extra time to read that he did not need when he took the SAT.
His professors in recent college classes in 2021 and 2022 also submitted strong
letters of recommendation for his law school admissions packet to the Law School
Data Assembly Service (LSDAS) that collects the records needed to apply to all
law schools in the nation.   Those letters are "stale" now and he needs recent
scholarship to be considered for admission according to Yale Law School.  So he
needs another full year of classes to generate new letters of recommendation.

77.   So, in 2022 only the GRE test was missing from his admissions packet
because ETS refused to allow it to be done fairly, given Mel's reading disability.

78.   **Element (3)**, being denied the *meaningful* "benefits of the program

25

solely by reason of his disability", is also alleged here because taking the GRE

without the extra time as an accommodation would deny Mel a *meaningful* benefit

of the test because he would surely fail it without the extra reading time since he

could only reach and answer 1/5th of the questions in the time ETS permits.

79.   Mel tested this speed in a college genetics class in 2019.  The professor

refused to allow the extra time to take her first test that Mel requested, to see what

Mel could reach.  He was only able to reach 20% of the questions on the test and,

therefore, failed the test and the college agreed to a withdrawal from the school

without a grade (that also proves how hostile colleges are to the disabled).

80.   It is for this jury then, to determine if the 300-500% extra time to take

the test would be a "reasonable" accommodation to make the test meaningful for

plaintiff to take it without fear that his disability will cause failure, according to

this San Diego Federal Court in <u>Musgrove v. Hanifin</u>, at iv:  "Reasonableness

`depends on the individual circumstances of each case, and requires a

fact-specific, individualized analysis of the disabled individual's circumstances

and the accommodations that might allow him to [enjoy meaningful access to the

program.]'", following the direction of the federal appeals court over this court.

81.   That means there is no "one-size-fits-all" fixed accommodation that a

defendant can impose for everyone as ETS clearly forces on the disabled, and as

suggested by <u>Folkers v. City of Waterloo, Iowa</u>, 582 F.Supp.2d 1141, 1153 [13]

(N.D. Iowa 2008)("There is no "one size fits all" formula for what process is due in all circumstances. . . The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner.").

82.  **Element (4)**, the requirement of federal funding is also alleged here, and proved with Exhibits at G that show ETS admitting federal funding, and these were only a fraction of the hundreds of federal grants the ETS has received in 7 decades and continues today to receive.   Exhibit L is another recent piece of documentary evidence proving it.

83.  **Element (5)**, the lack of *meaningful* benefit is alleged above at paragraphs (¶¶) 3, 5, 32, 38, and especially 79 where Mel says he could only answer 20% of the questions that tests give in the rigid time they set for those with good vision, and that would result in a terrible failure on the GRE test and the elimination of admission to all law schools with sufficient reputation to market one's skills as a patent specialist or as a general lawyer.   That makes the rigid rule of ETS less than meaningful, so it is a violation of the Act.

84.  And for injunction, the court is limited to stopping the "inadequacy" of the defendant's poor accommodation and nothing more, as held in <u>Armstrong v. Davis</u>, 274 F.3d 849, 881 (9ᵗʰ Cir. 2001)("the remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established").

85.  But injunction is a matter for the judge only after a jury finds the ETS

fixed solution of 100% accommodation and no more, to be inadequate. This because adequacy of the accommodation of ETS is a question of fact, and only the jury can decide if the rule for 100% accommodation is adequate and meaningful, or not.

86. **Element (6)**, the duty to prove deliberate indifference, was explained in that appeals court decision in <u>Mark H. v. Hamamoto</u> at p. 1096, which held the jury must also find the person denying that meaningful access must show the defendant is guilty of "deliberate indifference" as well.

87. That is alleged above at ¶¶ 28-29 that the ETS refused to give a model of what might pass to allow more time, and refused to say anything that Mel's eye specialist could use.

88. Mel's submission of those letters to the jury at trial that show the callous excuses ETS gave constitute the proof required.

89. For instance, when Mel asked at ¶¶ 28-29 that the ETS send a copy of a petition for extra time to take the test that met the parts they required, but to remove or *redact* the names of those test-takers so as not to reveal anything confidential, the response of ETS was to ignore that invitation to remove identifying information entirely. They answered that they cannot provide it because it is confidential.

90. That can only mean revealing what works is confidential because ETS

does not want to approve any extension at all. That proves a fixed decision not to remedy the inadequate 100% accommodation and that means deliberate indifference.

91. Mel actually cited the Berkeley case to the ETS to show he was not asking to alter the test. He did not ask for easier questions. He did not ask to be allowed to answer only 200 questions rather than 1,000 that all test takers had to answer. He only asked to allow him to take longer to answer all of the same questions because he cannot hurry up his eye injuries. A blind man cannot restore his own sight because it is annoying to a testing agency to add more hours as are necessary, as the Office of Civil Rights suggested at In re: U.C. Berkeley. Mel is not blind. But the analogy still fits.

92. The ETS ignored that case, and a half dozen follow-ups Mel sent.

93. Therefore, that pattern of the ETS refusing to go beyond their 100% rule no matter how serious the disability, showed "deliberate indifference" because they refused to budge after attempts to provide the extra proof they needed, and they refused to provide an example of what would qualify for them, and they entirely ignored the request of a leading eye specialist in the world to provide her with more detail or example, just to be stubborn.

94. The federal appeals court in Boston ruled refusing only *once* to stop the violation may constitute reckless indifference, at Sanchez v. Alvarado, 101

F.3d 223, 229 (1ˢᵗ Cir. 1996)("we in no sense mean to suggest that a supervisor escapes liability by conducting a formal investigation into each harassment complaint . . . a failure to take prompt and emphatic action could constitute reckless indifference").

95.   And the federal appeals court here ruled a deliberate decision not to remedy against violations constitutes *deliberate* indifference, at <u>Oden  v.  Northern Marianas College, supra</u>, 440 F.3d 1085, 1089 (9ᵗʰ Cir. 2006)(college itself  may be liable for deliberate indifference to civil rights wrongs if a jury "could find that the College made 'an official decision ... not to remedy the violation'").

96.   Or, mere repeated refusals to stop the violation after multiple requests also constitutes deliberate indifference, as suggested by <u>McGukin v. Smith</u>, 974 F.2d 1050, 1060 (9ᵗʰ Cir. 1992).

97.   That is what the conduct of ETS shows: a deliberate decision not to accommodate meaningfully and a refusal to provide a meaningful accommodation several times.

98.   And it also allows punitive damages, as in the  <u>Kolstad</u> case (above).

99.   That is because they had no intention of allowing any additional time beyond their 100% limit, ever.

100.   **Element (7)**, actual injury, is also alleged above at ¶ 8 showing Mel has now lost at least 5 years of salary as a patent attorney or patent agent and that

is actual injury. And he alleged emotional distress from the loss of career fear

which is also injury that the jury may compensate him for under the Rehabilitation

Act, according to McAlindin v. County of San Diego, 192 F.3d 1226, 1232-33 (9th

Cir. 1999).

101. That emotional distress then generated internal organ damage, that

combined with an existing infection he acquired from an unrelated medical

problem, created a new medical condition which is serious and can lead to system-

wide bacteremia, sepsis and death.

102. This aggravation of his existing condition was in part, caused by this

frustration and fear. It was also caused by Mel's efforts to find a different career,

and return to college in 2021 to take 2 years of classes to try admission to a

graduate program in philosophy. That discipline does not require the GRE test for

graduate schools. That effort failed, however, despite his GPA of 4.0 in 8 new

classes taken in 2021-2022 because he was informed, and Exhibit M supports the

information, that an applicant will not be admitted to a graduate school for

philosophy unless he can prove he had "a long-term interest in that field" as the

UCSD circular warns, which means many more classes at top ranked college and

not a junior college. Because Mel did not have a long standing interest in that

field, he was denied admission to those graduate schools.

103. Further, Mel exhausted the philosophy courses available at local junior

colleges. He would need two more years of philosophy classes at 4 year colleges to prove long standing interest, but he cannot pay the $80,000 a year the top schools require just to go back and take 2 more years of philosophy courses to qualify for admission to a PhD program that would then require 7 more years in the graduate school to graduate with a PhD and get work because that would make less salary than 3 years in law school would produce. Exhibit N shows the new lawyer salaries at Yale and other top law schools. Had Mel been admitted to any of those, he wold be making far more salary after 3 years than 9 years of philosophy courses could provide.

104. Thus, Mel did his best to "mitigate damages" which is to try to work around the bias of the GRE test, but that effort failed. The least costly choice to Mel and to the ETS is this present law suit is for the jury could make an award of $1 million to compensate Mel for the loss of 5 years of future earnings and for another $1 million for emotional and physical pain and suffering and mental stress.

105. That might be enough to pay for the tuition and room and board for a full extra year of classes at a top college at a cost of $80,000 a year just to produce new letters of recommendation for law school applications, plus the same cost of $80,000 a year of law school after federal income taxes are paid on that verdict at the highest tax rate, or $2.4 million for 3 years of law school, to allow Mel to get

through law school if this jury finds ETS violated the Act so the judge can order ETS to give Mel the extra time he needs to take their test meaningfully.

106.  And the jury could add to that award any amount between $1 million and $760 million against ETS and in favor of Mel as a punishment of ETS to wake them up and make them change their ways, and that extra amount could allow Mel a better chance to finish those classes and undertake meaningful medical treatment for his aggravated condition ETS caused, and to start that career that he has thus far been denied.

107.  Mel acknowledges these efforts to overcome the rigid ETS bias against the disabled were not the only cause of his medical troubles, nor his sleeping disorder.  But the jury may still make an award for Mel for the full value of new emotional and physical injuries if it finds the ETS stubborn refusal to allow a meaningful accommodation was a *substantial* factor, even though not the only factor, in causing those additional medical *complications* as held in Scirex Corp. v. Federal Ins. Co., 313 F.3d 841,  849-50 (3d Cir. 2002)(the direct cause of a loss "does not have to be the sole cause or immediate cause" of plaintiff's loss for him to prevail, "but need only be a proximate or substantial cause" of the loss to allow a damages award) and SAIF Corp./Oregon Ship v. Johnson, 908 F.2d 1434, 1441 (9th Cir. 1990)("The doctrine of aggravation . . . holds that the [person causing an

aggravation in a pre-existing condition] must fully compensate a [victim] whose . . . injury 'aggravates' a pre-existing condition").

108.  Further, Mel's injury actually extends to the loss of the entire career rather than just 5 years of salary and emotional distress coupled with physical symptoms from that distress.

109.  This is because in Mel's panic and fear to get his legal career going rather than just die because of the ETS testing refusal, Mel attempted to demand from Yale and NYU and other schools to admit him without taking the admission test and to force the American Bar Association to lift their requirement of taking those tests so he could get going and not sit around like an unemployed invalid until he dies.

110.  Those demands succeeded with the American Bar Association, because they lifted their 50 year requirement of taking the LSAT or GRE nation-wide as a condition for law school admission in 2023 under threat of legal action by this plaintiff.  So Mel's desperation may have helped some other disabled students who would also fail to become lawyers because they too cannot take the GRE or LSAT.

111. But Mel's efforts failed with the law schools.  On Mel's follow-up efforts with those law schools they demonstrated that they knew who Mel was and

told him they would *still* not admit him even without the test requirement by the Bar Association.  So, word got around against Mel's attempt to force his way into those schools since the ETS barred him from using the normal test method.  That means this rigid ETS refusal to grant an accommodation that is meaningful was a substantial cause of those law schools permanently preventing Mel from admission to those schools.

112.  Therefore, Mel's career as a patent lawyer will likely be blocked permanently by a refusal of any top law school to admit him no matter what his GRE score after this court orders ETS to accommodate better (if this jury finds the ETS refusal to budge was a violation because it is unreasonable).

113.  On that basis Mel has now lost a 20 year career as a patent lawyer at $400,000 a year for a loss of $8 million, or a 20 year career as a patent agent earning at least $163,000 a year for 20 years for a loss of $3.26 million because the Patent Office still requires an American law degree for a patent agent license.

114.  Or, if Mel failed to get a patent agent license and had to practice general law  on graduation from a top law school, he would have earned $50,000 *more* a year in salary instead.  Exhibit N shows the average salary for Yale law grads last year was $204,668 and the average for Cornell law grads was $50,000 more.

115.  WHEREFORE, Mel seeks and is entitled to a jury award against the

ETS for $8 million if the jury finds it is a fair measure of his economic loss, and for $1 million for personal injuries and pain and suffering based on emotional trauma and physical organ damage moving therefrom, but he may not ask for punitive damages under the Rehabilitation Act.  He also asks for interest on compensatory damages at the 10%.  And if this jury agrees ETS denied Mel the accommodation he should have had and thereby violated the Rehabilitation Act, Mel asks the judge for an injunction to bar ETS from refusing to grant the accommodation hereafter that Mel's doctors requested.

## SECOND COUNT FOR VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA) AT 42 U.S.C. §§ 12132 and 12181

116.  All allegations above are incorporated into this cause of action by this reference.

117.  Courts have held that the rules used to allow a jury to make an award under the ADA are largely the same as for the Rehabilitation Act with the following exceptions.

118.  **First**, under the ADA, there is a presumption that the accommodation sought by the disabled *must* be granted unless the defendant demonstrates the extra accommodation "would impose an undue hardship", according to McAlindin

36

v. County of San Diego, 192 F.3d 1226, 1237 (9th Cir. 1999).

119.  ETS can try to argue undue hardship, but the Office of Civil Rights has already implied at Exhibit I in the U.C. Berkeley case, that merely providing more time to the disabled to finish their courses, as long as the disabled condition needs, cannot be an undue hardship and the University of California agreed.

120.  Yet it is for this jury to decide if adding 3 extra days of testing, not two years, is an undue hardship when the questions are the same and the content is the same and the grading of right answers in the test is the same as all test takers get, no matter what the ETS says and no matter what the Office of Civil Rights and U.C. Berkeley says.

121.  In this respect, this jury is the most powerful legal body in the nation, greater than the Congress, the Supreme Court, and the President.  It need not follow established social norms in making its award as long as it is based on enforcing fundamental fairness and following the guidelines of this trial judge in the process of finding what is fair.

122.  In creating those guidelines, the court of appeals in McAlindin v. County of San Diego ruled at p. 1236 that in making that finding of hardship to ETS the jury must consider "the issue is . . . whether the [defendant] took reasonable steps to accommodate his limitations".  The proof against hardship here is ETS' refusals and denials of information that were not reasonable steps,

because "stonewalling" is not a reasonable step toward accommodation.

123. **Second**, under the ADA, a plaintiff can sue on the basis that the defendant was effectively a "public place" and denied accommodations at that place to allow the disabled equal access to the benefits there, where equal access does not mean just physical proximity but equal chances to have the full benefit available, according to Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1081 (9th Cir. 2004) ("The ADA's implementing regulations are designed 'to place those with disabilities on an equal footing" with those who have no disabilities and "an employer who treats a disabled employee the same as a non-disabled employee may violate the ADA").

124. That is what ETS does. Mel needs at least 300% more time to read the same questions as others. Denying that by putting Mel on equal footing with 100% extra time group to read the same questions as the healthy test takers, is a refusal to put him on equal footing.

125. **Third**, under ADA discrimination sections which include §12132 and § 12181-84, the jury may award *punitive* damages here in Count II that the jury could not award under the Rehabilitation Act at Count I, as held in Gribben v. United Parcel Service, Inc., 528 F.3d 1166, 1172 (9th Cir. 2008)("A punitive damages instruction may, however, be warranted in connection with Gribben's disability discrimination claim . . ..").

126.  Additionally Mel may assert these rules using the ADA in the same law suit as the Rehabilitation Act rules since ADA rules apply to govern the conduct of private schools *as places of public accommodation* that the Rehabilitation Act might not, as held in Kaltenberger v. Ohio College of Podiatric Medicine, 162 F. 3d 432 n. 4 (6th Cir. 1998)(under 42 U.S.C. § 12181(7)(J) (postgraduate private schools, or other places of education, are considered public accommodations and the ADA prohibits discrimination in public accommodations at 42 U.S.C. § 12182).

127.  This catches the ETS because its publications at Exhibits F and O show its status as a *de facto* private college in New Jersey and shows ETS took federal  funding to teach students with visual disabilities.  So ETS is effectively a postgraduate private school for test takers with visual disabilities, and the ADA provides that public teaching facilities are places of "public accommodations" at 42 U.S.C. § 12182.

128. But the common legal rule the jury needs for *both* ADA and Rehabilitation Act decisions is a finding that ETS placed a limit on the accommodation it would allow when the disability needs more, according to the appeals court in Armstrong v. Davis, 275 F. 3d 849, 862-63 n. 20 (9th Cir. 2001)(defendant may violate these acts if the administrative board places a limit on the accommodation allowed where the person needed more to be meaningful)

and <u>Stevens v. Harper</u>, 213 F.R.D. 398, 375 (N.D. Cal. Sept. 11, 2002)(alleging a failure of accommodation is enough to state a claim without showing how).

129. Finally, the jury can make an award in Mel's favor if it finds he was denied an educational opportunity that would not have been denied but for the ETS failure to accommodate his disability, as held by <u>Damron v. North Dakota Commissioner of Corrections</u>, 299 F. Supp. 2d 970, 975 (D. N.D. 2004)(denial of educational opportunity others get, states a claim).

130. Mel proves this is the case here. He was clearly denied educational opportunities in the law schools and graduate schools he described above, and he will likely be denied admission to those schools now because of his panicked effort to force his way in to Yale and NYU and others after the ETS would not compromise its rigid cap on disability accommodation.

131. He actually had a duty to make those efforts and annoy those colleges because an injured victim must "mitigate harm" visited upon him before suing the ETS, and that means attempting other avenues to remedy the problem first. Mel did so. But his efforts backfired.

132. Additionally, since punitive damages are not tied directly to the actual harm visited upon the victim like 10 times greater or 100 times greater than compensatory damages, the jury may award punitive damages to punish the

offending company or college regardless of the compensation award it makes for loss of salary.  So the jury may award punitive damages against ETS for any amount up to 1/3 of the value of ETS, as long as they also make some award for compensation damages at the same time, under the rules of <u>Passantino v. Johnson Consumer Products</u>, 212 F.3d 493, 509 (9th Cir. 2000)(the jury must intend to award compensatory damages if they want to award punitive damages under the federal disability law) and  <u>Kirkbride v. Lisbon Contractors, Inc.</u>, 521 Pa. 97, 555 A.2d 800, 803-04 (1989) (punitive damages need not bear a reasonable relationship to compensatory damages under tort law), and <u>Slaughter v. Legal Process and Courier Service</u>, 162 Cal.App.3d 1236, 1252, 209 Cal.Rptr. 189 (1984)(punitive damages recoverable on a showing of malice by a defendant), and <u>Kolstad v. American Dental Ass'n</u>, 527 United States Supreme Court 526, at page 535 (1999)(the definition of malice that allows punitive damages is not hatred or ill-will: it is only enough that the defendant knew or *should have known* that he "may be acting in violation of federal law" ), and <u>Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.</u>, 155 Cal. App. 3d 381, 391 (1984)("Net worth generally is considered the best  measure of a defendant's "wealth" for purposes of assessing punitive damages") and <u>Finney v. Lockhart</u>, 35 Cal.2d 161, 163, 217 P.2d 19 (1950)(punitive damages are available for preventing someone from entering a campaign career).

133.  WHEREFORE, Mel seeks and is entitled to a jury award against the

ETS for $8 million for loss of the entire legal career,  or for $3.26 million for loss

of the patent agent career, whichever the jury finds is a fair measure of his

economic loss, and for $1 million for personal injuries based on emotional trauma

and physical organ damage and pain and suffering moving therefrom, and for an

additional amount in punitive damages up to 1/3 of the net worth of ETS which is

$760 million, and for interest thereon at 10% per year since 2022, and if this jury

agrees ETS denied Mel the accommodation Mel should have had and thereby

violated the ADA, for an injunction by the judge to bar ETS from refusing to grant

the accommodation hereafter that Mel's doctors requested.


## III.

## COUNT THREE FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

134.  All allegations above are incorporated into this cause of action by this

reference.

135.  Mel registered with the ETS as an applicant in 2019, hoping to take

the GRE as soon as he took classes he needed to generate letters of

recommendation.

136.  That contract did not say the ETS would limit a disability

accommodation to 100% extra time to take the test.

137. The February 2022 letter from ETS supports that fact by inviting Mel to submit recent letters from doctors that could generate 300-500% extra time to take the test.

138. Therefore, ETS was subject to the implied covenant of good faith and fair dealing that imposes "the obligation for neither party to a contract to 'do anything that will injure there [sic] right of the other party to receive the benefits of the agreement", as held at Gopinath v. Somalogic, Inc., No. 3:23-cv-1164, at B (S.D. Cal. Nov. 22, 2023).

139. ETS breached that implied covenant by failing to provide sufficient information Mel's doctors needed so frame a successful petition to extend test-taking time by 300-500% as described above at ¶¶ 28-29.

140. Further, ETS breached that covenant by refusing to agree to redact or remove confidential information about any prior test taker who was approved for extended test taking time in excess of 100%, and send that petition to Mel or to Mel's eye specialist.

141. That excuse ETS staff gave was "lame", by saying they could not share confidential information of another applicant, because once the identifying information is removed it is no longer about another applicant.

142. These refusals constituted "conscious and deliberate acts" to frustrate

Mel's contractual rights to make a fair and competent petition to extend testing

time to 300-500% and were not just honest mistakes, bad judgment or negligence,

because the numbers of refusals by ETS to allow more time can only be explained

by a deliberate policy to refuse, as in <u>Chateau Chamberay Homeowners Ass'n v.

Associated Int'l Ins. Co.</u>, 108 Cal.Rptr.2d 776, 783 (Ct.App. 2001).

143.  Mel was injured by that breach of the implied covenant because it

prevented Mel from making a petition that the ETS would approve, and that

prevented Mel from taking the GRE test in 2022 and 2023 and 2024, and that

prevented Mel from applying to any law school in 2022 and 2023 and 2024.

144.  And that prevented Mel from graduating in 2025 to 2028 and earning

$200,000 a year for 5 years as an attorney or $163,000 a year as a patent agent.

145.  That loss also generated serious medical problems in Mel, aggravating

existing injuries and creating new ones as described above.

146.  These lost years and payments were reasonably foreseeable by ETS, as

described above, since ETS had spent decades studying the effect and

consequences of testing on applicants with visual disabilities.

147.  This breach of the covenant of good faith was an actual, substantial or

proximate cause of those losses.

148.  The damages available for a breach of contract are those "reasonably

foreseeable by them" when "the contract was entered into", according to this court

at L1 Technologies, Inc. v. Chekanov, No. 3:20-cv-259-H-JLB at ii (S.D. Cal. Aug. 30, 2023).

149.  WHEREFORE, Mel seeks and is entitled to a jury award against the ETS for $8 million or for $3.26 million whichever the jury finds is a fair measure of his economic loss, and for $1 million for personal injuries based on emotional trauma and physical organ damage and pain and suffering moving therefrom, or for $1 million as a fair measure of his loss of salary for the period 2022 to 2027 plus $1 million for personal injuries based on emotional trauma and physical organ damage and pain and suffering.

150.  Mel also seeks and is entitled to an injunction against ETS if this jury finds they did breach the covenant of good faith and fair dealing, to bar the ETS from refusing to give the GRE test to Mel with 500% extra time over several days, and with more breaks for movement as his other disabilities require than for those without those other physical disabilities.

///

## IV.

## CONCLUSIONS

151.  Given the above remedies, if the jury agrees that the conduct of the ETS was unreasonable or that additional time to answer its GRE questions is not an undue burden, plaintiff seeks and is entitled to an award of compensation by the jury for the amounts requested in Count I under the Rehabilitation Act of $10 million, and to add to that an award of compensation by the jury for the amounts requested in Count II under the ADA of another $10 million and for punitive damages under the ADA of $760 million, and *also* to add to that amount if the jury finds it fair to do so, an award of compensation for the amounts requested in Count III for violation of the covenant of good faith and fair dealing of another $10 million.  All these together mean a total of $30 million in compensation and $760 million in punitive damages, and for the judge to enjoin ETS from refusing to administer the GRE test to Mel with the extra time his doctors requested of 300-500% extra time over several days and for frequent breaks for Mel's back disabilities as he may require based on back pain he suffers sitting for a long time.

152. These allegations are verified.

DATED:  January 17, 2024

_Mel M_ _____
Mel  Marin